GODERICH, Judge.
The plaintiffs, Mickey Arison and Nati-onsBank, N.A., appeal from an adverse Amended Final Judgment. We affirm.
On July 28, 1997, NationsBank entered into a Credit Agreement with Carnival Air Lines, Inc., n/k/a Pan American Airways Corp. [Pan American Airways] and Pan Am Corporation [Pan Am], The Credit Agreement established two separate loan facilities. The first, Revolving Credit Facility A [Facility A] had a maximum borrowing availability of $12,500,000, that was later reduced to $7,500,000. The second, Revolving Credit Facility B [Facility B] had a maximum borrowing availability of $12,500,000.
Section 2.3 of the Credit Agreement provided that any monies received in payment of the Credit Agreement would first be applied to Facility B and then to Facility A. The Credit Agreement also provided that it and any other loan document may be amended, but only if such amendment was in writing and signed by Pan Am and NationsBank. The provision stated:
Any provision of this Agreement or any other Loan Document may be amended or waived if, but only if, such amendment or waiver is in writing and is signed by the Borrower, Pan Am and the Lender;....
At the time that the Credit Agreement was executed, Arison executed an Individual Guaranty and Suretyship Agreement wherein he personally guaranteed collection of the amounts drawn on Facility B. Arison did not personally guarantee the collection of Facility A.
By late 1997, Pan Am and Pan American Airways had drawn on all amounts available under Facility A and Facility B and desired to increase the maximum borrowing availability. As a result, on or about December 11, 1997, NationsBank, Pan Am, and Pan American Airways entered into a Consolidated Amendment to the Credit Agreement which provided for Credit Fa *103 cility C with a borrowing availability of up to $5,000,000.
The Consolidated Amendment expressly provided for an order of repayment and amended Section 2.3 of the Credit Agreement as follows:
Except as provided in Section 2.6 and Section 10.5 principal payment shall first be applied to the payment of Revolving Credit Facility B, then to Revolving Credit Facility C, and finally to Revolving Credit Facility A.
Section 2.6(a), as amended in the Consolidated Amendment, provided:
Each such reduction [in principal] shall be in the aggregate amount of $100,000 or such greater amount which is an integral multiple of $10,000, or the entire remaining Total Revolving Credit Commitment, and shall permanently reduce first Revolving Credit Facility B, then Revolving Credit Facility C, and finally Revolving Credit Facility A.
Section 10.5(a) of the Credit Agreement remained unchanged by the Consolidated Amendment and provided that, in the event of default, certain administrative fees and expenses were to be paid first, then interest due on all the credit facilities, and then principal on the credit facilities. Specifically, section 10.5(a) stated:
Allocation of Proceeds, (a) If an Event of Default has occurred and not been waived, and the maturity of the Notes has been accelerated pursuant to Article X hereof, all payments received by the Lender hereunder, in respect to any principal of or interest on the Obligations or any other amounts payable by the Borrower hereunder, shall be applied by the Lender in the following order:
(i)amounts due to the Lender pursuant to Sections 2.8, 8.8, 84, and 11.5; [various fees and expenses]
(ii) payments of interest on Loans and Reimbursement Obligations;
(iii)payments of principal of Loans and Reimbursement Obligations; ...
On the same day, December 11, 1997, Ari-son executed a Second Individual Guaranty and Suretyship Agreement for collection of Facility C.
On December 12, 1997, Pan Am’s shareholders, Eastern Airlines, Inc. [Eastern], Phillip Frost, M.D. and Frost Pan Investment Corporation [Frost Pan], Hershel Smith, Jr., and Cobb Partners, Limited [Cobb Partner] [referred to collectively as “Indemnitors”], entered into an indemnification agreement with Arison with respect to Facility C. Section 1 of the Indemnification Agreement provided, in relevant part:
(A) Each Indemnitor absolutely, unconditionally and irrevocably agrees to indemnify and reimburse Guarantor for and from any and all amounts expended from time to time by Guarantor in excess of Guarantor’s Share (as hereinafter defined) of the Obligations (as hereinafter defined)....
For the purposes hereof, a party’s “Share” of an Obligation shall mean the product of (i) the percentage interest ... and (ii) the amount of the Obligation. For the purposes hereof, “Obligations” shall mean the sum of (i) all amounts up to $5,000,000 paid by Guarantor in a lump sum or from time to time to NationsBank as a result of NationsBank’s enforcing or requiring payment under the Guaranty, which payment pursuant to the Guaranty reimburses NationsBank for unrepaid principal under Facility C, plus (ii) “Pro Rata Interest Obligations,” plus (iii) “Pro Rata Other Obligations.”
*104 [[Image here]]
(D) Notwithstanding anything contained herein to the contrary, in no event shall any Indemnitor be deemed to have guaranteed an obligation of Pan Am, any affiliate thereof or Guarantor or shall be deemed to have assumed an obligation to indemnify Guarantor for any other matter relating to the Credit or otherwise, including without limitation, any payment of Facility B.
(E) ... The obligations of the Indemni-tors shall not be affected, modified or impaired upon the happening of any event, including, without limitation, any of the following:
[[Image here]]
(ii) any amendment, modification, waiver or consent to a departure from the terms of the Credit Agreement ...;
(iii) any failure, omission, delay or lack on the part of Guarantor to enforce, exercise or assert any right, power or remedy conferred upon him under the Credit Agreement, the Guaranty or related documents;
[[Image here]]
(vi) any other event or action that would, in the absence of this clause, result in the release or discharge by operation of law of any Indemnitor from the performance or observance of any obligation, covenant or agreement contained in this Agreement.
Pursuant to the terms of the Indemnification Agreement, each shareholder obtained a standby Letter of Credit from their respective banks in an amount in accordance with their individual obligations.
In early 1998, Pan Am and Pan American Airways filed a petition in bankruptcy for reorganization under Chapter 11 of the Bankruptcy Code. NationsBank asserted a secured claim of $26,000,000. Nations-Bank agreed that its secured claim would be deemed satisfied by the payment of $20,500,000 and that it would have an allowed unsecured claim in the amount of approximately $5,200,000.
On June 30,1998, NationsBank collected $20,500,000 from the bankruptcy estate. On July 15, 1998, NationsBank wrote to Arison demanding payment under the Second Individual Guaranty and Suretyship Agreement. On July 21, 1998, Arison wrote to the Indemnitors enclosing the NationsBank letter and requesting a meeting to discuss the demand and the respective obligations of the parties. On August 20,1998, the parties met.
On April 19, 1999, NationsBank and Ari-son entered into an Assignment and Indemnification Agreement, and on April 27, 1999, Arison paid NationsBank $5,410,069.44. On April 28, 1999, Arison wrote to the Indemnitors demanding indemnification.
On May 11, 1999, Arison drew down on the Eastern Letter of Credit in the amount of $1,500,000. On May 12, 1999, Arison drew down on the Cobb Letter of Credit in the amount of $529,000. On June 12, 1999, Arison drew down on the Frost Letter of Credit in the amount of $621,000, and NationsBank as the issuer of the Frost Letter of Credit demanded repayment from Frost.
Arison and NationsBank filed suit against the Indemnitors seeking payment under the Indemnification Agreement of those sums still due and owing after application of the proceeds of the letters of credit. NationsBank also sought reimbursement from Frost and Pan Frost under the letter of credit that it had paid to Arison. Each of the Indemnitors other than Smith filed Counterclaims. Cobb Partners and Eastern filed Counterclaims for declaratory relief and sought reim *105 bursement of the sums paid to Arison pursuant to the letters of credit. Frost and Pan Frost filed a Counterclaim for declaratory relief. Smith filed an Answer and Affirmative Defenses.
All parties filed cross-motions for summary judgment based upon a Stipulation of Undisputed Facts submitted by all parties. After a hearing, the trial court entered a Final Judgment in favor of the Indemnitors. The Final Judgment, however, failed to address the issue of the reimbursement to the Indemnitors of the sums paid under the letters of credit. Accordingly, the Indemnitors moved to amend the final judgment, and the trial court entered an Amended Final Judgment. Arison and NationsBank appeal from the Amended Final Judgment.
Arison and NationsBank contend that the trial court erred by denying their motion for summary judgment and by granting summary judgment in favor of the Indemnitors. We disagree.
Arison and NationsBank argue that the parties’ obligations are governed solely by the Indemnification Agreement and that as such, the Indemnitors were required to indemnify Arison for the monies he paid to NationsBank. Although we agree that the parties’ obligations are governed by the Indemnification Agreement, we do not agree that it required the In-demnitors to indemnify Arison under the above-described circumstances.
A review of the relevant documents shows that the Indemnity Agreement incorporated by reference the Credit Agreement and the Consolidated Amendment. OBS Co. v. Pace Constr. Corp., 558 So.2d 404, 406 (Fla.1990)(“It is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing.”); Quix Snaxx, Inc. v. Sorensen, 710 So.2d 152, 153 (Fla. 3d DCA 1998)(same). Section 2.3 of the Credit Agreement and amended section 2.3 of the Consolidated Amendment require an application of principal payments first to Facility B, then to Facility C, and lastly, to Facility A. In accordance with this provision, the proceeds from the Pan Am Bankruptcies should have been applied first to Facility B, then to Facility C, and lastly, to Facility A, thereby relieving the Indemni-tors of any obligation under the Indemnification Agreement because Facility B and Facility C, the facility guaranteed by Ari-son and indemnified by the Indemnitors, should have been fully repaid by the bankruptcy proceeds.
Arison and NationsBank argue that section 10.5 of the Credit Agreement expressly authorizes the order in which the bankruptcy proceeds were actually applied by NationsBank, namely Facility A, Facility B, and lastly, Facility C. NationsBank maintains that the provisions of section 2.3 govern the application of payment while the loan is performing but that section 10.5 controls the manner in which payments will be applied after default.' A review of section 10.5 shows that although it does control the event of default and does address the order of allocation of different types of obligations, i.e. first, fees and expenses, then interest, then principal, etc., it does not change the order of repayment of the loan facilities. Therefore, section 2.3, the more specific provision governing the order of repayment of principal controls the order of the application of the bankruptcy proceeds as between the various loan facilities. Proser v. Berger, 132 So.2d 439, 441 (Fla. 3d DCA), cert. dismissed, 136 So.2d 343 (Fla.l961)(“[I]t is an often announced rule of construction that specific provisions of an agreement are to be given such effect as to supercede provi *106 sions in conflict with them which have been stated in general terms.”)
Lastly, Arison paid NationsBank the amounts due on Facility A without any legal obligation to do so. As such, Arison made a voluntary payment for which the Indemnitors could not be liable. Wright v. Fidelity Cas. Co., 139 So.2d 913, 915 (Fla. 1st DCA 1962)(holding that if a surety was not obligated under the terms of its bond, then any sums expended by it for that purpose would have been as a mere volunteer for which liability could not be imposed on the indemnitors under the terms of the indemnity agreement).
For these reasons, we find that the trial court properly denied the plaintiffs’ motion for summary judgment and properly granted summary judgment in favor of the Indemnitors. We affirm the Amended Final Judgment.
Affirmed.